Filed 4/4/14  P. v. Maldonado CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>KEVIN MALDONADO,<br><br>       Defendant and Appellant. | A132029<br><br>(San Mateo County<br>  Super. Ct. No. SC070139A) |

Defendant Kevin Maldonado appeals from a judgment entered after a jury found him guilty of first degree murder of Israel Polvo (Pen. Code, § 187, subd. (a)[1]), with a related firearm use sentence enhancement (§ 12022.53, subd. (d)), and attempted deliberate and premeditated murder of Ulises Jaimes (§§ 664, 187, subd. (a), 189), with a related firearm use sentence enhancement (§ 12022.53, subd. (c)).  The court sentenced defendant to an aggregate term of 50 years to life in state prison, consisting of consecutive terms of 25 years to life on the murder count and the related firearm use sentence enhancement, and concurrent terms of 7 years to life on the attempted murder conviction and 20 years to life for the related firearm use sentence enhancement.[2]

---

[1]     All further unspecified statutory references are to the Penal Code.

[2]     Before trial defendant pleaded no contest to possession of a firearm by a felon (former § 12021, subd. (a)(1)).  The court imposed but stayed a term of two years, pursuant to section 654.  The court also dismissed sentence enhancement allegations that defendant was on probation when he committed the charged offenses.

1

On appeal defendant advances several arguments challenging his convictions. We conclude that none of his contentions, either singly or together, requires reversal. Accordingly, we affirm the judgment.

## FACTS

### A.    Prosecution's Case

On or about August 22, 2009, defendant and Jaimes got into a verbal argument, which lead to a fist fight. Defendant threw the first punch. Jaimes clearly got the better of the fight and beat defendant up. Defendant's injuries included a black eye and a bloodied lip. Jaimes hurt his knuckles and received stitches to close the wound on his knuckles. During the next two weeks, defendant and Jaimes saw each other on an almost daily basis. They exchanged threats with each man expressing anger and requesting a rematch.

On the afternoon of September 6, 2009, Jaimes and Mark Rodriguez were riding in Jaimes' car. Jaimes saw a man on the street motioning to him to pull over. Jaimes pulled his car over but did not get out of the car. The man, later identified as "Scarface," asked if Jaimes was the person that had beaten defendant.[3] Jaimes replied, "Yeah." Scarface then said he was going to shoot Jaimes or Jaimes was going to get shot. Jaimes threw a beer bottle at the man and "took off." Jaimes took the threat seriously, and went to look for defendant "[b]ecause [he] felt threatened" although he did not associate the threat or think the threat had anything to do with defendant. When asked why he was then mad at defendant, Jaimes said, "I guess I felt, I was buzzed, so I was, you know, I don't know." Jaimes had been drinking beer and smoking marijuana. [4]

---

[3]    Both Jaimes and Rodriguez testified that a photograph of the man that was identified as Scarface by the police was not the man who made the threat.

[4]    Rodriguez recalled the events somewhat differently. Rodriguez testified that Scarface did not ask if Jaimes was the person who had beaten defendant. Scarface just asked if Jaimes was Jaimes. When Jaimes say, "yeah, why?," Scarface said "you need to be easy because you're going to get clapped." Rodriguez understood Scarface's statement to mean that Jaimes was going to get shot. Jaimes replied, "By who, by you?" Rodriguez did not recall Scarface's reply. Jaimes then threw a beer bottle at Scarface.

2

Later at about 6 p.m., Jaimes' friend Polvo called and asked Jaimes to pick him up and take him (Polvo) to drop off some marijuana. Jaimes did not tell Polvo about the fight he had with defendant, nor did he tell Polvo he wanted to fight defendant. Jaimes did not ask Polvo for a weapon or "some kind of protection." At trial Jaimes and Rodriguez testified that neither of them nor Polvo were armed with a weapon. As the three men rode around, Jaimes and Polvo had a discussion about the man who had threatened Jaimes earlier that evening. Polvo wanted to look for the man who had threatened Jaimes. However, when Jaimes drove past defendant's home, Jaimes decided to stop and challenge defendant to a fight. [5]

Jaimes drove by defendant's home, made a U-turn, and drove back toward defendant's house arriving at 8:40 p.m. and 18 seconds. [6] Jaimes saw defendant come out of his house. Jaimes stopped his car in the middle of the road on the wrong side of the street in front of defendant's house. Defendant's girlfriend Elizabeth Puga's car was parked on the street near defendant's house, but Jaimes never saw Puga either sitting in the car or in the street. Jaimes got out of his car followed by Polvo. Rodriguez remained in the car. Jaimes and Polvo stood in the street about four feet apart from each other but several feet from defendant who was standing on the sidewalk near his driveway. Jaimes stood with "both of his hands clenched in front by his sides" and no higher than his waist. He said to defendant, "What's up? What you trying to do?" Polvo stood with his hands up either even with his shoulders or maybe a bit higher and more in an open palm

---

[5] Rodriguez recalled the events somewhat differently. Rodriguez testified that after the incident with Scarface, Jaimes was mad and called Polvo on the telephone. Rodriguez did not remember Jaimes' exact words, but the gist of the conversation had "something do with Kevin," that Jaimes "needed help to beat him up or something," or that Jaimes wanted to confront defendant because of the threat that Jaimes was going to get "clapped." Once Polvo was in the car, Jaimes said that if defendant was outside "we're going to bail out on him." Rodriguez understood that to mean that "they were going to jump out and try to beat [defendant] up."

[6] The position of certain vehicles and persons and the sound of gunshots was recorded in part by a surveillance camera on private property near defendant's house and city ShotSpotter sensors that had been placed outside defendant's house.

3

manner.  He said, "What's going on?"  Defendant from his position on the sidewalk did not respond to Jaimes.  Instead, defendant pulled out a gun and fired three shots in the direction of the victims from several feet away.[7]  The shots were fired at 8:40 p.m.: The first shot at 8:40 and 37.1 seconds, the next shot at 8:40 and 38.2 seconds, and the third shot at 8:40 and 38.6 seconds.  All three shots were fired within one and a half seconds.  Defendant's first shot fatally struck Polvo in his chest near his left armpit area.  When Jaimes saw Polvo get shot, Jaimes "ducked and . . . just ran" away. Defendant's next two shots pierced the back of the shirts Jaimes was wearing, but Jaimes was not struck.  After firing the three shots, defendant fled the scene in Puga's car at 8:41 p.m.[8]  Responding to a 911 call, the police found three cartridges for a .380 semiautomatic weapon but did not find either the expended bullets or a weapon.

The prosecution also proffered evidence of defendant's recorded jail telephone calls, during which defendant and Puga discussed various topics including how to get rid of "the 38s," and that defendant wanted Puga to give the bullets to a man known as Scarface.  Defendant did not say anything about shooting Polvo in self-defense or to protect himself during these conversations.  The police searched Scarface's home but they did not locate any evidence connected to the homicide or firearms of any kind. Defendant was interviewed by San Mateo police detectives on two occasions.  Defendant denied he was present at the shooting or that he even knew Jaimes.  Defendant provided two conflicting alibis regarding his whereabouts on the evening of the shooting.

---

[7]     Jaimes testified that neither he nor Polvo rushed up the driveway toward defendant or attempted to attack defendant's girlfriend.

[8]     Rodriguez recalled the events somewhat differently.  Rodriguez testified that after Jaimes stopped his car, both Jaimes and Polvo "bail[ed] out" and just ran towards defendant.  Rodriguez thought to himself that he was going to need to break them up and he looked to see if any cars were behind them.  Before he could do anything else, "in less than five seconds" Rodriguez heard two or three gunshots; he did not know who got hit or what happened because it happened so fast.  Rodriguez got out of the car and saw Polvo lying on the ground.  Rodriguez attempted to help Polvo and then Rodriguez called 911.

4

Although the police suggested to defendant that the incident could have been self-defense, defendant never indicated he acted in self-defense.

### B. Defense Case

Defendant did not testify at trial. He presented his theory that he acted in self-defense and in defense of others through the testimony of Puga. She testified that on the night of the shooting, defendant was inside his house and she was sitting in her car outside of his house when Jaimes showed up. Jaimes drove by, made a u-turn, and then drove back and parked in front of defendant's house. Puga saw defendant walk out of his house and down the driveway toward the sidewalk. Within seconds, Jaimes and Polvo got out of the car "really fast" and "rushed" toward defendant. All three men engaged in a struggle "more on the sidewalk right in front of [defendant's] house." Jaimes and Polvo were "swinging" their arms and "throwing punches." Defendant, who was about three inches taller than both men, was moving his arms as if he was trying to protect himself. None of the men had anything in their hands. Jaimes and Polvo did not threaten defendant and defendant did not say anything to the men. Within five seconds of the beginning of the struggle, Puga got out of her car and tried but could not get between defendant and the two men. She used one hand to shove Polvo on his right shoulder but he did not react. Puga ran back to her car to retrieve the steering wheel lock to use as a weapon. Puga was inside her car reaching for the lock when she heard three gunshots. She saw Polvo with both his hands in his belly and slumped over. Puga turned on the car and defendant got in and told her to drive to his friend Scarface's house. Puga dropped defendant off outside Scarface's house and then she drove home. During the drive to Scarface's house, Puga asked defendant if he shot someone and he said yes; they did not discuss further details of the shooting. Puga testified that defendant never told her he got rid of the gun. However, she conceded that she had testified at the grand jury that defendant told her he gave the gun to Scarface. Puga further recalled that while defendant was in jail he told her "to give the 38s [bullets] to Scarface." Puga did not act on defendant's request because she did not have the ammunition.

### C. Jury Instructions and Verdict

The trial court instructed the jury, in pertinent part, on homicide (CALCRIM No. 500), justifiable homicide based on the theory of self-defense or defense of another (CALCRIM No. 505), first and second degree murder with malice aforethought (CALCRIM Nos. 520 and 521), the defense of provocation (CALCRIM No. 522), voluntary manslaughter based on the theories of heat of passion and imperfect self-defense (CALCRIM Nos. 570 and 571), attempted murder and the related allegation of deliberation and premeditation (CALCRIM Nos. 600 and 601), and attempted voluntary manslaughter based on the theories of heat of passion and imperfect self-defense (CALCRIM Nos. 603 and 604). The jury found defendant acted with deliberation and premeditation when he fired his gun at Polvo and Jaimes and rejected the defense theories of provocation or self-defense or defense of others.

## DISCUSSION

### I. Sufficiency of Evidence of First Degree Murder Conviction

Defendant challenges his first degree murder conviction on the ground there was no substantial evidence to support the jury's finding that he acted with deliberation and premeditation when he killed Polvo. "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).) "If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139, fn. omitted.)

In support of his argument that there was a lack of evidence of premeditation and deliberation, defendant relies on *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, in which our Supreme Court identified "three basic categories" of evidence "to sustain a finding of premeditation and deliberation:" " 'planning' " activity, " 'motive,' " and "*manner* of killing." (*Id*. at pp. 26-27.) "Drawing on these three categories of evidence,

6

*Anderson* provided one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. In so doing, *Anderson*'s goal 'was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) Nevertheless, our Supreme Court has "repeatedly pointed out" and "reaffirm[ed]" that " '[t]he *Anderson* guidelines are descriptive, not normative. [Citation.]' [Citation.] They are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

In the context of first degree murder, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 (*Mayfield*).) "[D]irect evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances in the case as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the jury for determination." (*People v. Isby* (1947) 30 Cal.2d 879, 888.) Nor does the process of premeditation and deliberation require any extended period of time. " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' " (*Mayfield, supra*, p. 767.)

On this record we can easily conclude the record supports the jury's findings that the shooting of Polvo occurred after a deliberated, premeditated decision to kill. Jaimes had previously beaten defendant in a fist fight and in the two weeks preceding the shooting the men's animosity continued unabated. Defendant's decision to arm himself with a loaded firearm in advance of any confrontation with Jaimes supports an inference of planning activity. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 ["defendant brought

7

a loaded handgun with him on the night [the victim] was killed, indicating 'he had considered the possibility of a violent encounter' "]; *People v. Wright* (1985) 39 Cal.3d 576, 593, fn. 5 ["[o]f course, use of a deadly weapon is not always evidence of a plan to kill[]' . . . , but obtaining such a weapon in advance of a killing is one fact that has been held to support an inference of planning activity"].) The jury could have also reasonably found that the victims' conduct in suddenly confronting defendant was with the intent to engage in a fist fight and was not legally sufficient to provoke a reaction of gunfire by defendant. Moreover, the jury could reasonably infer from the testimonial and forensic evidence that defendant had sufficient time to fire a warning shot or otherwise attempt to defuse the situation. Instead, without a word, defendant fired a shot at a vital area on Polvo's body. After the shooting, defendant did not come to Polvo's aid, but fled the scene and hid the weapon used in the shooting. This evidence allowed the jury to reasonably infer that defendant's act of shooting Polvo was not the result of a rash impulse, but rather a deliberate and premeditated act that occurred after an opportunity for reflection. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [defendant's firing of his gun at a victim's vital area at close range supported a finding of premeditation and deliberation]; *People v. Clark* (1967) 252 Cal.App.2d 524, 529 [defendant's obvious attempt to conceal the murder weapon and failure to secure medical attention for victim supported a finding of premeditation and deliberation].) By his arguments defendant "simply asks this court to reweigh the facts." (*Bolin, supra*, 18 Cal.4th at p. 333.) The cases cited by defendant do not compel a different conclusion on this record.

## II. Admission of Defendant's Other Crimes

### A. Relevant Facts

During pretrial proceedings the prosecutor asked the court to rule on the admissibility of defendant's prior criminal conduct (sustained juvenile petition for robbery and an adult conviction for assault). The evidence was proffered to establish that on previous occasions defendant had acted as an aggressor thereby negating his claims of provocation, self-defense, and imperfect self-defense. (Evid. Code, § 1101, subd. (b).) In support of the request, the prosecutor relied on a California Supreme Court decision

which held that "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent," and that the reoccurrence of unlawful conduct tends increasingly with each instance to negate "accident or inadvertence or *self-defense* or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*), italics added; see 2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, p. 241.) The court ruled, over defendant's objection, that the prosecution would be allowed to present evidence of defendant's prior criminal offenses of robbery and assault pursuant to Evidence Code section 1101, subdivision (b), for the limited purpose to prove defendant's intent and to disprove his anticipated claim of self-defense and defense of others, as requested by the prosecutor.

**B.** **Analysis**

Defendant argues the court erred in allowing into evidence his prior criminal offenses of assault and robbery. However, we need not address his contention. On this record we conclude that any asserted error was harmless because it is not reasonably probable that a result more favorable to defendant would have been reached absent admission of the evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Contrary to defendant's contentions, any potential for prejudice by admission of the challenged evidence was decreased by the circumstances that the evidence of dissimilar other crimes was "no stronger and no more inflammatory than the [evidence] concerning the charged offenses." (*Ewoldt, supra,* 7 Cal.4th at p. 405; see *People v. Collie* (1981) 30 Cal.3d 43, 64 ["[e]vidence of past offenses may not improperly affect the jury's deliberations if the . . . charged offense is dissimilar . . . ."].)[9] Indeed, given the

---

[9]    During the trial the prosecutor presented evidence of defendant's prior criminal conduct through the testimony of three witnesses. The juvenile robbery incident concerned a purse snatching that was elevated to a robbery, when defendant used force to grab a purse from a female victim, causing her to fall to the ground. The parties stipulated that defendant had suffered a sustained juvenile petition for robbery. The adult assault incident occurred while defendant was incarcerated in the local jail. A female

9

circumstances, "it [is] unlikely that the jury disbelieved . . . [the evidence] regarding the charged offenses but nevertheless convicted defendant on the strength of [the evidence] . . . regarding the [prior criminal] offenses, or that the jury's passions were inflamed by the evidence of defendant's [prior criminal] offenses." (*Ewoldt, supra,* 7 Cal.4th at p. 405.) Moreover, both the prosecutor's closing statements[10] and the court's instructions[11] informed the jury that the other-crimes evidence was not sufficient to prove

---

deputy sheriff had admonished defendant to stop making certain hand gestures as he appeared to be communicating with another inmate in violation of jail rules. When the officer went to confront defendant in his cell, defendant started to flail his arms at the officer. As the officer grabbed at him, defendant fell toward the officer, a fight began, and defendant took several swings at the upper torso of the officer's body. The officer was able to get defendant under control with the assistance of other officers. The officer was not badly hurt in the fight and she did not seek medical care.

Before the assault victim testified, defense counsel expressed his concern that the witness might testimony about "gang signs being thrown" during the incident. The trial prosecutor confirmed that he had agreed that no mention of gangs would be made before the jury. Instead, the assault victim would simply testify that defendant had committed "some sort of violation of a jail rule without getting into specifically what it was." The trial court concurred with counsel that "it would not be appropriate to introduce the concept of gang evidence within the confines of [Evidence Code section] 1101. That would be prejudicial under [Evidence Code section] 352 to the defendant." The assault victim testified consistent with the court's ruling and did not refer to the hand gestures as gang signs. Consequently, we find nothing in the record that supports defendant's argument that the assault victim's testimony about defendant's hand gestures allowed the jury to prejudicially infer that defendant was a gang member.

[10]    In closing argument the prosecutor mentioned defendant's prior criminal conduct, stating the jury "can only use that evidence for a very limited purpose" to evaluate whether defendant had without provocation attacked people on prior occasions; the jury could not use the evidence "just to consider" that defendant was "a bad guy, he took a purse from someone, he fights with deputies and, thus, we should convict the guy;" and the other crimes evidence showed "the defendant is perfectly capable of attacking people without any need for provocation whatsoever. It undercuts the argument of both self-defense and provocation."

[11]    The court specifically advised the jurors that they should first consider whether defendant had committed the uncharged criminal offenses, and then if the jury so concluded the offenses had been committed, the evidence could only be considered "for the limited purpose" of deciding whether on prior occasions defendant had attacked others without provocation and for no other purpose; the jury was to consider the

10

defendant's guilt of the charged offenses and the jurors were required to consider "all of the other evidence before convicting defendant" of the charged offenses. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1015 (*Reliford*).) The jury was also instructed as to the elements of murder in the first degree, attempted murder, that a conviction required proof beyond a reasonable doubt, and that for each offense a guilty verdict required proof of a union or joint operation of act and the requisite intent (CALCRIM Nos. 220, 251, 520, 521, 601). "No reasonable juror would believe those requirements could be satisfied solely by proof of" defendant's commission of the other crimes evidence. (*Reliford, supra*, at pp. 1013-1014.) [12]

similarity or lack of similarity between the prior criminal conduct and the charged offenses; the jury was not to conclude from the prior crimes evidence that defendant had a bad character or was disposed to commit crimes; and the prior crimes evidence was only one factor and not sufficient by itself to prove defendant committed the charged offenses beyond a reasonable doubt.

[12]     Defendant argues that reversal is required because the prosecution cannot show that the improper introduction of the other-crimes evidence was harmless beyond a reasonable doubt, citing to *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) However, our Supreme Court has held the *Watson* test is "applicable to alleged errors in the admission of other-crimes evidence." (*People v. Thomas* (2011) 52 Cal.4th 336, 356, fn. 20, citing to *People v. Malone* (1988) 47 Cal.3d 1, 22 [Supreme Court rejects defendant's argument that admitting other-crimes evidence should be reviewed under the reasonable doubt standard in *Chapman*].) In all events, even if we applied the *Chapman* standard, on this record we would conclude that any asserted error in the admission of the other-crimes evidence was harmless beyond a reasonable doubt. At trial defendant did not deny he fired a gun at both victims. The only substantive issue was whether defendant was sufficiently provoked and acted in self-defense or defense of others. "[F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted.) In this case there was substantial testimonial and forensic evidence demonstrating that the victims approached defendant intent on a fist fight and from several feet away defendant responded by firing his gun three times, the first shot fatally striking Polvo in the chest area and the second two shots piercing Jaimes' clothing as he fled the scene. Because defendant's guilt was established even absent the other-crimes evidence, any error in admitting the challenged evidence does not warrant reversal under any standard of review.

## III.   Admission of Threat Evidence

### A.   Relevant Facts

During the pretrial proceedings, defendant filed a motion in limine to preclude the prosecutor from introducing evidence (through the testimony of Jaimes and Rodriguez) that Scarface informed Jaimes that Jaimes was going to be shot. Defendant asserted that the proposed testimony should not be admitted as it was "hearsay," "unreliable," "vague," and "not trustworthy." The court held an Evidence Code section 402 hearing during which only Jaimes was called to testify regarding the threat allegedly made by Scarface. [13] Jaimes testified that Scarface asked him if he was the "guy that had fought Kevin." When Jaimes confirmed he was the guy, Scarface said Jaimes should "watch [his] back because we was going to get shot up." Scarface did not say defendant or anyone associated with defendant was going to shoot Jaimes. Nor did Jaimes ever see Scarface with defendant and know that Scarface was associated with defendant. After hearing Scarface's threat, Jaimes was angry and wanted to confront defendant because defendant was telling "so many people" about their earlier fight.[14]

The trial court granted the prosecutor's request to allow Jaimes to testify as to the threat made by Scarface. In so ruling, the court explained the evidence was not hearsay but admissible to explain Jaimes' state of mind and his subsequent conduct after hearing the threat. As to defendant's assertion that Jaimes' use of alcohol and marijuana on the day of the incident rendered the threat testimony unreliable, the court ruled that evidence of Jaimes' intoxication could be used to impeach his credibility. The court also rejected defendant's Evidence Code section 352 argument that the threat evidence should be

---

[13]   Defendant did not request that Rodriguez testify at the Evidence Code section 402 hearing or ask that the court tentatively rule on the admissibility of Rodriguez's testimony. Nor did defendant object during trial to Rodriguez's testimony regarding Scarface's statements.

[14]   During the trial Jaimes did not repeat his hearing testimony that he wanted to confront defendant because defendant was telling people about their earlier fight. Jaimes testified only that the threat made him mad and he wanted to confront defendant because he (Jaimes) was buzzed or for some unknown reason.

excluded as unduly prejudicial because "the foundation is vague at best," and Jaimes' testimony was not credible or reliable. The court found that there was "enough foundation to allow the testimony. There [was] enough linkage between the statement made to Mr. Jaimes and then his subsequent actions."[15]

## B.    Analysis

Having considered defendant's challenge to the admission of the threat evidence on the grounds it was not relevant and unduly prejudicial, we conclude his contentions do not require reversal.[16]

As to the matter of relevancy, the trial court admitted the threat evidence for the limited purpose of explaining Jaimes' reason for going to defendant's home on the night of the shooting. Specifically, the threat evidence, "is an example of ' "one important category of nonhearsay evidence—evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162; see *People v. Samuels* (2005) 36 Cal.4th 96, 122 [court properly admitted out-of-court statement to explain witness's subsequent actions].)

---

[15]    Although the court indicated it would give a limiting instruction as to how the jurors were to evaluate the threat evidence, there is no evidence that defense counsel asked the court to give such an instruction and none was given. "[I]n the absence of a request by the defense," the court was under no sua sponte duty to give the jury a limiting instruction. (*People. v. Riccardi* (2012) 54 Cal.4th 758, 825; see *People v. Alvarez* (1996) 14 Cal.4th 155, 214-216 [accord]; see Evid. Code, § 355 [trial court, "upon request," shall instruct the jury about evidence admitted for a limited purpose].)

[16]    Defendant also argues the threat evidence should have been excluded because it was likely to confuse the issues. Because defendant did not seek to exclude the evidence on that basis, he has forfeited the issue on appeal. In all events, given the nature of the threat evidence as presented through the trial testimony of Jaimes and Rodriguez, we conclude there was no danger of jury confusion.

We also conclude the trial court reasonably found that admission of the threat evidence would not be unduly prejudicial. Defendant complains that the jury was allowed to hear evidence "that someone was planning to shoot Mr. Jaimes. In turn, the jury was allowed to make the inference that the shooting of Mr. Polvo and Mr. Jaimes was something that had already been planned for and anticipated." However, " ' "[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1449.) As noted, the prosecutor proffered the threat evidence to explain Jaimes' presence at defendant's home. The fact that the trial testimony of Jaimes and Rodriguez did not connect defendant to Scarface made the threat evidence less prejudicial as it would not tend to evoke an emotional bias against defendant.

Even without the threat evidence, as we explained in our earlier discussions, the jury had before it substantial testimonial and forensic evidence demonstrating defendant's guilt. Thus, it is not reasonably probable that a result more favorable to defendant would have been reached absent admission of the threat evidence. (*Watson, supra,* 46 Cal.2d at p. 836.)

## IV. Admission of Evidence of Puga's Conviction As An Accessory

### A. Relevant Facts

After the shooting Puga was charged with being an accessory after the fact to murder and attempted murder. She pleaded guilty to the two charges and she was promised a maximum sentence of 16 months in prison if she testified truthfully at defendant's trial. The plea agreement also provided that if Puga testified truthfully at defendant's trial, the prosecution would dismiss the charge of accessory after the fact to attempted murder and recommend a county jail sentence.

During pretrial proceedings defendant moved in limine to exclude reference to Puga's plea agreement. The court denied the motion, explaining: Puga's "plea bargain[ ] is relevant . . . to the jury to determine whether she's telling the truth about what she observed and what her role was. I'm going to ask that the references to the 32 [accessory

14

charge] be limited to the 32 and not refer to 32/187 [accessory to murder] so that [the] jury doesn't draw some inappropriate conclusion that somehow her conviction is making more credible the claims against or allegations against [defendant]. [¶] And please remind me that we will come up with a jury instruction, a limiting jury instruction that the material regarding her plea bargain is only being allowed for the limited purpose of evaluating her credibility."

The prosecutor decided not to call Puga as a witness. Instead, Puga was called as a witness by defendant. During his direct examination of Puga, defense counsel elicited testimony regarding Puga's plea agreement. Counsel sought to have Puga identify the executed plea agreement, however she testified it was just a paper that her lawyer told her to sign and she did not realize she would be pleading guilty to two charges. Puga acknowledged that as part of the plea agreement she understood she was required to testify truthfully, that she had told the truth during her grand jury testimony and that she was telling the truth at trial. The prosecutor extensively questioned Puga about the events of the evening of the shooting, her testimony before the grand jury, and her conversations with defendant after the shooting, but he did not question Puga about her plea agreement. Nor did the prosecution mention Puga's plea agreement in his closing argument. In his summation arguments, defense counsel urged the jury to credit Puga's testimony because "based on the plea agreement that she made . . . she was obligated to tell the truth in this courtroom" and "[h]er sentence will depend on it." Defense counsel also explained to the jury how they were to evaluate Puga's status as an accessory: "Now, the judge will instruct you on that aspect that an accessory to the commission of a felony may be prosecuted, tried and punished without regard to the status of the alleged principal in the case. [¶] What this means is that you can't take the fact that Ms. Puga plead as an accessory to mean that she's saying that she knows her boyfriend is guilty of any kind of crime at all. Just because she plead guilty doesn't mean it. You can infer that she made this deal. There are any number of reasons she made, might have made a deal like this. I mean, she was pregnant. She may have . . . felt threatened by the district attorney or threatened by the police, so she plead. Her calculation as to her situation or her own guilt

15

or innocence is far different than my client's . She was not acting in self-defense either. She was reacting to the situation that happened afterward."

The court instructed the jury that "[a]n accessory to the commission of a felony may be prosecuted, tried, and punished, without regard to the alleged status of the alleged principal in the case." The court also advised the jury: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. [¶] If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. [¶] If you find that a witness has committed a crime or other misconduct, you may consider that fact in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

### B. Analysis

Defendant argues the court erred when it failed to exclude evidence of Puga's conviction as an accessory because it was irrelevant to her credibility and unduly prejudicial. We disagree.

Contrary to defendant's contention and irrespective of whether the prosecution or the defense initiated the inquiry, evidence of Puga's conviction as an accessory was "relevant to [her] credibility." (*United States v. Halbert* (9th Cir. 1981) 640 F.2d 1000, 1004.) Indeed, our Supreme Court has mandated "full disclosure to the jury of any [plea] agreement bearing on [a] witness's credibility, including the consequences to the witness of failure to testify truthfully." (*People v. Fauber* (1992) 2 Cal.4th 792, 823; see Evid. Code, § 785 ["[t]he credibility of a witness may be attacked or supported by any party, including the party calling him"].) Puga, who was called by the defense, was the only witness who testified the victims had actually engaged defendant in a physical attack immediately before defendant fired his gun. Thus, her credibility was a live and relevant

16

issue before the jury. (See *People v. Pearson* (2012) 53 Cal.4th 306, 323 [where there was evidence of conflicting narratives, in testimony and prior statements, of what defendant personally did to the victim, it was "a live issue" for jury whether defendant acted with the intent to kill or reckless indifference].)

Nor do we see any merit to defendant's assertion that reversal is required because the admission of the evidence of Puga's conviction was unduly prejudicial in violation of Evidence Code section 352. As we understand defendant's argument, he contends the admission of Puga's conviction as an accessory improperly allowed the jury to logically conclude that defendant must be guilty of some unspecified crime or the charged offenses. However, we reject defendant's claim of error because he ignores the circumstances in which the challenged evidence was presented to the jury. Despite having gained a favorable ruling allowing the admission of Puga's prior conviction, the prosecutor made a tactical decision not to call Puga as a witness. Instead, defendant called Puga as his witness and questioned her about her plea agreement. The admission of Puga's plea agreement allowed defense counsel to argue in closing that the jury should believe Puga because she was required to testify truthfully in compliance with her plea agreement. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 337-338.) We presume the jurors followed the court's instructions advising them that the challenged evidence was to be considered only for the limited purpose specified (Puga's believability as a witness) and for no other purpose and that defendant's culpability was not dependent on the fact that Puga had been convicted as an accessory. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940 ["jurors are presumed to be intelligent and capable of understanding and applying the court's instructions"].) Consequently, we find no support in the record for defendant's argument that the admission of Puga's conviction as an accessory created "undue prejudice . . . in the minds of the jury against [defendant] in violation of California Evidence Code [s]ection 352."

17

## V.    Trial Court's Discharge of a Juror During Deliberations

### A.    Relevant Facts

After the jury had reached a tentative verdict but before the verdict was announced in open court, the trial court informed counsel that Juror No. 7 had been in contact with the bailiff during the trial. The court explained the circumstances of the contact: "[E]arly on in the trial, Juror No. 7 . . . contacted my bailiff about participating in an opera . . . . When my bailiff told me about this I said to him that if he wanted to participate in [a]n opera or play he could do that when the trial was over, that's his business, not mine, but that he was to have no contact with the juror about this play until after the trial was done. And I made that order because obviously I didn't want to create an appearance of impropriety or unfairness in any way. [¶] Now I come to hear today, . . . which is January 19th, apparently the juror . . . brought these cards which are advisements for the opera, and handed them to the other jurors, which is fine, there's nothing wrong with that, but in so doing I guess on their way out to lunch indicated that my bailiff was going to be in the play. . . . [¶] So I talked to my bailiff about this in more detail and I've come to learn that . . . [my bailiff] has been talking to the director of the play . . . and there was discussion apparently of financial remuneration as well in the neighborhood of $10,000 for participation in this. [¶] Now, my bailiff has assured me multiple times that he has not talked to [Juror No. 7] about this, but obviously he has talked to the director and I believe my bailiff told me that there were five separate e-mails that went back and forth between my bailiff and the director."

The court and counsel first questioned the bailiff and then Juror No. 7 regarding their contacts during the trial. Both the bailiff and Juror No. 7 confirmed their contacts with each other as previously explained by the court. Before deliberations, the communications between the juror and the bailiff concerned the possibility that the bailiff would be given a role in an opera in which the juror also had a role. After their initial contact, the bailiff and the juror had no further communications concerning the matter until after the jurors had concluded their deliberations. Before announcing their verdicts in open court, the jurors went to lunch. When the jurors returned from lunch, Juror No. 7

18

was the last one to enter the jury room and he was holding cards advertising the opera. According to the bailiff, Juror No. 7 said to the bailiff that the juror had not told the other jurors of the bailiff's possible participation in the opera, but the bailiff was going to be in the opera. At the time Juror No. 7 spoke to the bailiff the juror was standing close to other jurors and the bailiff was sure the other jurors could have heard Juror No. 7's comment. Juror No. 7 testified that no other jurors were around at the time the juror made the comment to the bailiff that he was going to be in the opera.

Before ruling on the matter, the court asked both defense counsel and prosecutor their "take on the issue." Both counsel agreed that the court should discharge Juror No. 7 and seat the alternate juror. The court prefaced its ruling by commenting that it was "a very difficult call" as to whether to excuse the juror but ultimately concluded there was an "appearance of unfairness." "[T]he appearance problem is this: The bailiff, even though he's a neutral court attaché is also a law enforcement officer, so having contact with each other is not, from an appearance point of view, not appropriate. And, you know, the substance of it beyond that, I'm not sure I agree that that's a big problem, but the appearance of it is what concerns me the most . . . and I don't want this appearance to be, if the jury verdict was, and I have no idea what the verdict is obviously, it hasn't been delivered yet, all I know is that there is a verdict . . . . But if it was something like a first-degree murder or something, then, you know, the appearance of that becomes very, very significant." Consequently, the court agreed with counsel that "in excess of caution the fair and right thing to do is to excuse [Juror No. 7] and substitute the alternate and have the jurors come back tomorrow . . . so that I can instruct them that they have to start their deliberations all over again from the beginning." Because the jury had reached a verdict but not yet reported it, the court again asked defense counsel to confirm that it was his request to discharge Juror No. 7 and substitute the alternate juror, and counsel replied, "Yes." When the court asked defense counsel if his decision was "tactical," counsel asserted his main concern was ensuring defendant received a fair trial and the request to discharge and substitute jurors was made "having fully considered all the tactics involved

in this." Defense counsel had spoken to defendant, who concurred in his counsel's decision and expressly so informed the court on the record.

Before the newly configured jury was instructed as to its duties, defense counsel asked the court to instruct the jurors "to remove all of their work product" and "the charts that they may have made" before beginning new deliberations. The trial court denied the request for several reasons: there was no evidence the jury had made any charts during deliberations, there was no need to interfere with the deliberative process in the absence of a problem, and the newly configured jury would be instructed using the language in CALCRIM No. 3575 that deliberations were to start all over again and include the new juror in that deliberative process. "[T]o help implement" the instructions, the court directed the removal of the verdict forms that had been previously signed by the original jurors.

In response to the court's ruling, defense counsel asked the court to hold a hearing as to whether the remaining original jurors had actually created any charts or work product during their deliberations. Alternatively, defense counsel urged the court to instruct the jury that they were to disregard the charts and any work product that had been created by the remaining original jurors. The court denied defendant's requests, finding that the law did not require it "to go that far;" and that asking the jurors whether they created any documents "gets right into what their thinking is in their work product" and "crosses over the line into interfering with their deliberative process."

Before deliberations continued with the newly configured jury, the court gave the following instructions: "One of your fellow jurors has been excused and an alternate juror has been selected to join the jury. Do not consider this substitution for any purpose. The alternate juror must participate fully in the deliberations that lead to any verdict. The People and the defendant have the right to a verdict reached only after full participation of the jurors whose votes determine that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier

20

deliberations had not taken place. [¶] And we'll then ask you to please return to the jury room and start your deliberations from the beginning. My bailiff will come into the jury room to remove the previously written verdict forms. Those forms will be placed in a sealed envelope by the clerk and you'll be given brand new verdict forms to start over."

### B. Analysis

Defendant argues the trial court erred when it failed to declare a mistrial after it was discovered that Juror No. 7 had unauthorized contact with the bailiff. He also contends the court's refusal to order materials such as notes, charts, documents and other writings and work product be removed from the jury room effectively prevented the deliberations from beginning anew as required by law. We conclude defendant's arguments are unavailing.

There is no dispute that the court acted well within its discretion in conducting an inquiry to determine if Juror No. 7 should be discharged because of his unauthorized contact with the bailiff. (*People v. Farnam* (2002) 28 Cal.4th 107, 141.) Defendant's argument that the court should have conducted a further inquiry to determine if the remaining original jurors had been tainted by Juror No. 7's conduct is not properly before us. (*People v. Holloway* (2004) 33 Cal.4th 96, 124.) At the time the court considered the issue of Juror No. 7's conduct, it did not indicate any unwillingness to question the remaining original jurors and defense counsel made no such request at that time. "Having failed to suggest any additional examination was required, thereby preventing the trial court from considering any arguments for conducting further examination, defendant 'is not privileged to make the argument now for the first time on appeal.' " (*Id.* at pp. 126-127.) Similarly, we are not persuaded by defendant's argument that his consent to the court's ruling (discharge and substitution of jurors) "is of no import" or "no relevance." The record shows that the court did not make its decision to discharge Juror No. 7 and substitute an alternate juror until *after* it had asked both defense counsel and the prosecutor to comment on the appropriate remedy for Juror No. 7's conduct. The fact that the court gave defense counsel and defendant an opportunity to *reconfirm* their

21

position does not support an argument that defendant and his counsel had no opportunity to request a mistrial.

In all events, we reject defendant's argument that the court should have sua sponte declared a mistrial. As explained by our Supreme Court, a mistrial is not required "when a juror is dismissed for good cause after deliberations have begun. To declare a mistrial would surely present the opportunity to satisfy the essential requirement that a verdict be unanimously reached by 12 fully participating jurors in a subsequent retrial, but the right to trial by jury does not require a declaration of a mistrial when a properly qualified alternate juror is available and that juror fully participates in all of the deliberations which lead to a verdict." (*People v. Collins* (1976) 17 Cal.3d 687, 693 (*Collins*).) So "that each of the 12 jurors reaching the verdict fully participate in the deliberations just as each had observed and heard all proceedings in the case," the *Collins* court required that the trial court shall "instruct the jury to set aside and disregard all past deliberations and begin deliberating anew. The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had." (*Id*. at p. 694.) In this case the trial court instructed the jury in accordance with *Collins*.

Lastly, we see no support in the record for defendant's argument that the jury was effectively prevented from beginning deliberations anew because the court did not order the removal of "materials such as notes, charts, documents and other writings and work product" that may have been created during the deliberations with discharged Juror No. 7. Before accepting the verdicts of the newly configured jury, the court acted well within its discretion in refusing defendant's request for a hearing as to the existence of any documents or work product that the remaining original jurors may have created during their deliberations with discharged Juror No. 7. (*People v. Engelman* (2002) 28 Cal.4th 436, 443 ["[t]he very act of questioning deliberating jurors about the content of

22

their deliberations could affect those deliberations"].) Once the newly configured jury returned its verdicts and before the jurors were released, defendant could have preserved the record by asking the court to secure any material that may have been created during the deliberations with discharged Juror No. 7 and question the jurors about any use of such material during their deliberations. After the release of the jurors, defendant moved for a new trial but he does not explain why he did not seek relief based on this claim of error.[17] Consequently, we conclude a reversal is not required as defendant has failed to provide an adequate record demonstrating prejudicial error as a consequence of the court's challenged rulings. (See *People v. Dykes* (2009) 46 Cal.4th 731, 808, fn. 22 ["[t]he circumstance that defendant raised some juror misconduct claims in his motion for new trial does not serve to preserve other bases for his claim on appeal"].)

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

---

[17] After trial, defendant sought a new trial based on juror misconduct, which was supported by a declaration of his investigator who spoke with three jurors including the alternate juror who replaced discharged Juror No. 7. However, he did not complain that the newly configured jury could not or did not begin their deliberations anew because of the presence in the jury room of material created during deliberations with discharged Juror No. 7.